OPINION OF THE COURT
Arthur E. Blyn, J.
An indictment has been filed against the defendant accusing him of two counts of criminal possession of a weapon in the third degree. The charges are that on or about February 28, 1980, in the County of New York, the defendant possessed two loaded firearms, one a .38 caliber S & W pistol and a .32 caliber H & R pistol, said possession not being in defendant’s home or place of business.
Defendant, alleging that the weapons and the rounds contained therein were seized in violation of his constitutional rights, has moved to suppress such physical evidence. More particularly, in his moving papers, defendant alleges that police officers broke into the apartment without a warrant under no exigent circumstances, nor did they identify themselves and they had no consent to enter the apartment. Further, it is alleged that defendant was searched without probable cause on the basis that no contraband was visible.
The People claim, in essence, that the police officers possessed probable cause and were authorized to enter the subject premises without a warrant — that viewing the totality of the circumstances their conduct was more than reasonable.
The People have the burden, in the first instance, of going forward to show the legality of the conduct of the police while the defendant bears the ultimate burden of proving that the physical evidence should be suppressed by a preponderance of the evidence.
A Mapp hearing was held before this court on May 1, 1980. The sole witness, called by the People, was Detective Edward Berrigan. The court gives credence to his testimony.
The court makes the following findings of fact.
On February 28, 1980, at approximately 6:40 p.m., a civilian, one Sharod Sabb, came into the 26th Precinct and had a conversation with Detective Berrigan, assigned to that precinct and working that evening. Mr. Sabb was a black male approximately 30 years of age. He was dressed in a neat and clean shirt, with something over it, and a pair of dungarees. He appeared to have been drinking as Detective Berrigan *336 smelled alcohol on his breath. In the opinion of Berrigan he did not appear to be intoxicated as he could walk steadily and expressed himself in a cogent manner. Berrigan had never seen Sabb before nor was he an informant. In addition to giving his name Mr. Sabb gave his address, his date of birth, his Social Security number, and the name, address and telephone number of his employer.
For the next 20 minutes, while Detective Berrigan took notes, Mr. Sabb proceeded to relate the following sequence of events.
On February 27, 1980, at approximately 11:30 p.m., Mr. Sabb met a person known to him as Rick or Bob, whom he gave a detailed description of, on Broadway and 145th Street. The two men pooled their money and purchased vodka after which they went to the Hamilton Hotel, 30 Hamilton Place, near Broadway and 138th-139th Streets. They went to room 601 in the hotel where Mr. Sabb encountered a person he referred to as the fat fag. Mr. Sabb drank in room 601 and at approximately 2:30 a.m. on February 28, 1980 a black male entered the room carrying a green shoulder bag. The contents thereof were revealed, approximately 15 handguns, which were placed on a table. Other persons came into the room unknown to Mr. Sabb. He fell asleep at approximately 4:00 a.m., at which time the defendant was not present in the room. Mr. Sabb awoke at approximately 3:30 p.m. on February 28, 1980 and left room 601 in the hotel to go purchase some beer. He returned at approximately 5:00 p.m. Upon his return he saw a person, later identified as the defendant. Mr. Sabb gave the following description: a black male, 5 feet 6 inches tall, wearing brown pants and sneakers. An argument ensued between Mr. Sabb and the defendant at the conclusion of which the defendant pulled a silver revolver and said "I don’t like you nigger”. Mr. Sabb turned around and heard what he thought was a shot. Mr. Sabb quickly left room 601 and the hotel at which time he hailed a passing patrol car, from another precinct, which dropped him off in front of the 26th Precinct on 126th Street.
After Detective Berrigan’s conversation with Mr. Sabb, none of the information given having been verified, Detective Berrigan notified his superiors and from 7:00 p.m. to 7:15 p.m. he conferred with his immediate supervisor, a Sergeant Breen. From 7:15 p.m. to 7:30 p.m. consultations were had between *337 Detective Berrigan and the Manhattan District Attorney’s office.
Detective Berrigan and Sergeant Breen decided to bring the emergency service officers in on the operation. They were called at approximately 7:30 p.m. and arrived five minutes later, at which time Mr. Sabb was present. A 20-minute consultation ensued between Sergeant Breen and his men and the emergency service officers as to what strategy would be adopted upon reaching the Hamilton Hotel. Some eight policemen, including the emergency service people, and Mr. Sabb then departed for the Hamilton Hotel.
The hotel is located on Hamilton Place between 138th and 139th Streets where the group arrived at approximately 8:00 p.m. The building was described as having 10 plus floors. Upon arrival the officers surveyed the building for possible escape areas, etc. Upon entry into the premises a discussion was had with the desk clerk wherein he was told not to touch the telephone and inquiry was made of him to confirm the lack of outside fire escapes on the premises. The group proceeded up to the sixth floor which had a long hallway with doors to several rooms or apartments.
The group approached room 601 the door to which was closed and was described as being made of metal and/or wood. Voices were heard coming from the door but details of conversation could not be heard. It was between 8:25 and 8:30 p.m. when Detective Berrigan first knocked on the door, with a series of knocks lasting 10 seconds. There was no response but he continued to hear voices coming from the door. At that point Detective Berrigan knocked again, a second series of knocks lasting 10 seconds. From behind the door a voice, unable to be identified as to whether it was a male or female, said "who is it?” Detective Berrigan replied "police!” Someone came to the door, who Detective Berrigan could not see, and opened it partially, approximately one foot. When the door was so opened Detective Berrigan could not hear any voices or movement. Detective Berrigan backed away from the door and the two emergency service policemen put their shoulders to the door and opened it completely entering the premises with shotguns in ready position. In words or substance they said "don’t move”.
No policeman asked for permission or authority to enter the room or go through the door.
Room 601 of the Hamilton Hotel was described as having a *338 short hallway as one enters, approximately six feet long, which then opens up to a 12 foot by 15 foot single room with windows, tables, a refrigerator and stove with two doors inside the room.
The first time Detective Berrigan saw the defendant was when he, the detective, was in the aforesaid six-foot-long hallway at which time he observed the defendant standing erect at the opposite end of the room to the detective’s extreme righthand side. Defendant was approximately 12 feet away from the detective when he first saw him and Berrigan at that point did not observe any other people in the room.
Defendant was described as a black male, approximately 5 foot 6 or 5 foot 7 inches tall, wearing tan trousers and brown sneakers. He was also wearing a blue jacket which came down a little below the waist. The jacket had a zipper and was opened.
After walking in through the six-foot-long hallway, at a point when he was almost into the room itself, Detective Berrigan observed the defendant go into a crouch or semi-crouch position with his hands at his hips and observed the butt of a gun in the defendant’s waistband, left front, tucked into the top of his pants. At that same point in time Berrigan observed that there were other people in the room, three of them positioned to the left of the defendant.
The emergency service officers cocked the shotguns at which point defendant raised his hands in the air. Berrigan then entered the room completely and took the handgun previously described in the left front of the defendant’s waistband from him. The gun was described as a silver .32 caliber. After removing the aforesaid weapon from the person of the defendant Detective Berrigan found and removed another weapon from the right side of the defendant’s waistband, closer to the hip joint. Berrigan then examined the guns and found that the .38 was loaded with five rounds and the .32 was loaded with two rounds. (The guns, both received in evidence, had black butts; the barrel, trigger and cylinder on one was silver and on the other black.) Defendant was handcuffed and placed under arrest. At that time Mr. Sabb, who was on the scene and observed defendant with police officers, stated "that’s the man”.
As a safety precaution other officers on the team conducted an "inspection” of the premises checking under the bed and opening the closet and bathroom doors, looking for potential *339 other persons who might be armed with weapons. No other search of the room was conducted nor were any other persons found.
Defendant was removed to the 26th Precinct.
As to room 601 at the hotel, subsequent inquiry of the desk clerk indicated that that room was rented in the name of a Chris Washington, one of the other persons found in the room at the time the police entered. Defendant was not registered in any room at the hotel and upon his arrest he gave the address 58 East 127th Street.
An examination of the applicable legal principles must begin with the following relevant statutory provisions:
CPL 140.10 (subd 1, par [b]): "a police officer may arrest a person for: A crime when he has reasonable cause to believe that such person has committed such crime, whether in his presence or otherwise”.
CPL 140.15 (subd 4): "In order to effect such an arrest, a police officer may enter premises in which he reasonably believes such person to be present, under the same circumstances and in the same manner as would be authorized, by the provisions of subdivisions four and five of section 120.80, if he were attempting to make such arrest pursuant to a warrant of arrest”.
CPL 120.80 (subds 4, 5): "4. In order to effect the arrest, the police officer may, under circumstances and in a manner prescribed in this subdivision, enter any premises in which he reasonably believes the defendant to be present. Before such entry, he must give, or make reasonable effort to give, notice of his authority and purpose to an occupant thereof, unless there is reasonable cause to believe that the giving of such notice will:
"(a) Result in the defendant escaping or attempting to escape; or
"(b) Endanger the life or safety of the officer or another person; or
"(c) Result in the destruction, damaging or secretion of material evidence.
"5. If the officer is authorized to enter premises without giving notice of his authority and purpose, or if after giving such notice he is not admitted, he may enter such premises, and by a breaking if necessary”.
Initially it is necessary to dispose of two preliminary *340 questions characterized by the People as nonissues. The defendant takes the position, amply supported by the evidence and, for all intents and purposes, conceded by the People that there was no consent to enter room 601. Defendant further argues that no probable cause existed for either the warrantless arrest or search. In order to establish probable cause based upon an informant’s tip, whether for issuance of a search warrant or for a warrantless arrest and search, the reliability or credibility of the informant must be shown and, further, it must be demonstrated that the informant had a sufficient basis for concluding that the subject of the tip was engaged in illegality (People v West, 44 NY2d 656, and cases cited therein). Defendant contends that the People failed to show probable cause on the basis of Mr. Sabb’s statements as they were unverified and he was an unreliable source.
True, both on the basis of the information supplied by Mr. Sabb and Detective Berrigan’s personal observation, the former had imbibed in alcoholic beverages on the evening of February 27, 1980 and the early morning hours of February 28. Nonetheless, it was Berrigan’s opinion that Sabb was not intoxicated. Mr. Sabb proceeded to describe in detail the events that preceded his entry into the 26th Precinct, including his description of the defendant. It is beyond question that Sabb from firsthand knowledge related the defendant’s apparent illegal use and possession of a weapon. Sabb risked prosecution if his statements were fabricated (Penal Law, § 240.50). Further, he related detailed background information about himself to the police, including his employment.
The veracity and reliability of a known, disclosed citizen is not to be evaluated under the same standards as that of a paid or anonymous informer (People v Hyter, 61 AD2d 990; cf. Aguilar v Texas, 378 US 108; Spinelli v United States, 393 US 410). Considering the basis of Sabb’s knowledge, and his apparent reliability the court finds probable cause has been sufficiently established. (People v Hyter, supra.)
We now turn to the basic issue presented at this hearing. Did the police lawfully enter room 601?
On April 15, 1980 the Supreme Court of the United States decided the landmark case of Payton v New York (445 US 573). In reversing the Court of Appeals of the State of New York, that court held that the Fourth Amendment proscribes a warrantless entry into one’s home for the purpose of making a routine arrest, even if grounded upon probable cause, in the *341 absence of exigent circumstances. Before determining the applicability of Payton (supra), the first question which must be answered is whether the holding is retroactive, which is logically the position of the defense and a contrary position of nonretroactivity taken by the People.
In the leading case in the Supreme Court of the United States on the subject of the retroactivity of its decisions in the field of criminal procedure, Stovall v Denno (388 US 293), the court set forth the three basic criteria guiding the resolution of retroactivity: (1) the purpose to be served by the new standards, (2) the extent of the reliance by law enforcement authorities on the old standards, and (3) the effect on the administration of justice of a retroactive application of the new standards. After applying those criteria the court concluded that its decisions in Wade (United States v Wade, 388 US 218) and Gilbert (Gilbert v California, 388 US 263), decided therewith, dealing with identifications, should not be given retroactive application.
Prior to its holding in Stovall (supra) the court had held in Linkletter v Walker (381 US 618) that the exclusionary rule of Mapp (Mapp v Ohio, 367 US 643) would not be applied retroactively.
In Williams v United States (401 US 646) and Hill v California (401 US 797), decided on the same date, the court held that the doctrine enunciated by it in the Chimel case (Chimel v California, 395 US 752), narrowing the permissible scope of searches incident to arrest, shall not be applied retroactively.
Further, in Tehan v Shott (382 US 406) the court held against the retroactive application of the no-comment on defendant’s failure to testify rule enunciated in the Griffin case (Griffin v California, 380 US 609).
There have been incidents where that court has held in favor of retroactivity. In Stovall (supra) the court distinguishes its decisions in Gideon v Wainwright (372 US 335 [right to counsel]) and Jackson v Denno (378 US 368 [procedure for admission of confessions]) where retroactivity was found to be necessary, from the principle before it in that case. The heart of the matter is whether or not the rule of criminal procedure at issue was fashioned to correct serious flaws in the fact-finding process at trial.
Considering the Stovall criteria (supra), particularly the purpose behind the holding in Payton (445 US 573, supra) *342 limiting the permissible area of search or arrest without a warrant, the court finds the rule enunciated in Payton fits more appropriately with those rules found not to be retroactive in Stovall, Linkletter, Tehan, Hill and Williams (supra) rather than with those rules correcting serious and basic errors in the fact-finding process mandating retroactivity as in Gideon and Jackson (supra).
Accordingly, the court holds that Payton (supra) is not to be applied retroactively.
Assuming, arguendo, that Payton v New York (supra) is to be applied retroactively there is considerable doubt that the holding in that case applies to the circumstances at bar.
Initially, some confusion has arisen from defense counsel’s inartful use of the term "standing” in a dual capacity. Counsel argued that notwithstanding the fact that the defendant had no proprietary interest in room 601 he nonetheless had "standing” to challenge the legality of the seizure of the physical evidence citing Rakas v Illinois (439 US 128). Counsel further argued that the defendant had "standing” to oppose the seizure under the rule enunciated in Payton (supra). Analyzing Rakas (supra) together with Jones v United States (362 US 257), it is clear that defendant at bar having had a proprietary interest in the weapons seized from his person (see Rakas v Illinois, 439 US, at p 142, n 11), may legally challenge the seizure of those weapons. The use of the word "standing” in advancing the applicability of the Payton rule was therefore inappropriate as the question is not one of "standing” but of whether or not defendant may avail himself of the Payton rule.
In that connection the Supreme Court noted (Payton v New York, 445 US 573, 583, supra) "Nor do these cases raise any question concerning the authority of the police, without either a search or arrest warrant, to enter a third party’s home to arrest a suspect”. (Emphasis added.)
It is clear from the opinion in terms of analyzing the Fourth Amendment the court has delineated the boundaries of the zone of privacy so as to unequivocally draw a firm line at the entrance to a person’s home. On the other hand, there is no zone of privacy concerning warrantless seizure in a public place (United States v Watson, 423 US 411) and the Payton court went to great lengths to make this distinction. Whether there is any zone of privacy or expectation of privacy mandated by the Fourth Amendment which would insulate a *343 person from a warrantless arrest or seizure in the home of another remains to be seen.
Having so determined we return to the statutes quoted at the outset, CPL 140.15 and 120.80. Thereunder the police officers were clearly authorized to enter room 601. As to the manner of such entry, they were required prior to entry to give notice of authority and purpose unless same is excused.
The record clearly reveals that notice of authority was given prior to entry when Detective Berrigan said "police!” in response to the question "who is it?” from the unidentified voice behind the door. There was, however, no notice of purpose given prior to the emergency service policemen shouldering completely open the partially opened door. With the knowledge that the defendant some three hours earlier had drawn a weapon and in all likelihood discharged the same in the room and that some 18 hours earlier an arsenal of handguns had been in the room and there had been a number of people in and out of the room during the time period at issue, the court concludes that the officers had reasonable cause to believe that the giving of notice of purpose would endanger their or other persons lives or safety. Exigent circumstances have long been recognized which may allow dispensation with the notice (People v Floyd, 26 NY2d 558; People v Wojciechowski, 31 AD2d 658, affd 28 NY2d 498), such as reason to believe a person is armed or would offer violence. The concern expressed by the Court of Appeals in Floyd (supra, at p 562, n) that there might be greater reason for notice where the person might be armed to avoid a "shoot out” with unidentified intruders, is inapplicable at bar since notice of authority was given. As recently noted by the Appellate Division, Second Department, CPL 120.80 is designed as much to protect the safety of the police as the individual’s privacy (People v Reiff, 64 AD2d 719, 720).
One final comment on an argument advanced by the defendant. Citing People v Hodge (44 NY2d 553) counsel for the defense began his posthearing argument with the proposition that all warrantless searches are presumptively unreasonable per se and where a warrant has not been obtained it is the People who have the burden of overcoming that presumption. What counsel neglected to add was the language that preceded the foregoing statement (p 557) "In the absence of 'exigencies of the situation [that] made that course imperative’ ”. Defense counsel argued vigorously that the key *344 issue in this case was the 110 minutes that expired between the time Mr. Sabb first came to the 26th Precinct and the time Detective Berrigan knocked on the door to room 601. It was argued that that time lapse was more than sufficient to obtain a warrant — there were no fire escapes, no alternate exits, no shots fired, and no one’s life in danger. The court disagrees. Once again, attention must be focused on the circumstances existing at the time and place, that is — the defendant’s clear possession of a weapon and the likelihood that the same was fired in the room approximately 1 hour and 40 minutes before Sabb arrived at the precinct and the distinct possibility that the arsenal of weapons in the room observed by Sabb in the early morning hours on the date in question might still be present. The People point out that the gravamen of any inquiry regarding the Fourth Amendment is reasonableness. Possessed with the foregoing knowledge, the court finds that the conduct of the police in obtaining Sabb’s statement in detail, consulting with each other, consulting with the District Attorney’s office, consulting with and bringing in the Emergency Service Division and physically surveying the outside structure of the hotel was more than reasonable under the circumstances presented.
Since under the facts presented the police had probable cause to arrest the defendant and had a right to enter room 601 of the Hamilton Hotel in the manner in which they did, the seizure of the weapon the butt of which was in open view in the left front of the defendant’s waistband was entirely proper. Having made such observation and seizure the removal of the other weapon from the right side of the defendant’s waistband was likewise entirely proper.
Accordingly, defendant’s motion to suppress physical evidence is denied in its entirety.