THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WADE PONDER, Appellant.

Fourth Department, November 13, 1980

## APPEARANCES OF COUNSEL

*Alfred P. Kremer* for appellant.

*Lawrence T. Kurlander, District Attorney (Irene Dymkar* of counsel), for respondent.

## OPINION OF THE COURT

Dillon, P. J.

On February 10, 1977 Joseph Salerno was shot while being robbed in his hardware store in the City of Rochester. He died on March 8, 1977 as a result of the gunshot wound. Defendant was indicted as the perpetrator and upon a jury trial was convicted of felony murder (Penal Law, § 125.25, subd 3); manslaughter in the first degree (Penal Law, § 125.20, subd 1) and criminal possession of a weapon in the third degree (Penal Law, § 265.02, subd [4]).

To set the scene, we note that the victim's hardware store was located on the west side of Portland Avenue, directly opposite the westerly terminus of Fernwood Avenue which runs easterly from Portland Avenue. Aurora Street, which runs parallel with Portland Avenue, intersects with Fernwood Avenue three blocks east of Portland Avenue.

The facts as developed at the *Huntley* hearing show the following sequence of events. The shooting occurred at 4:40 P.M. and was immediately reported to the police who, within five minutes, arrived at the store. The first two officers there, Parks and Peck, observed Mr. Salerno's wound, and while Peck administered first aid, Parks obtained a description of the assailant and an account of the robbery from Mr. Salerno. Detectives Perticone and Alfieri and Officer Gropp arrived shortly after Parks and Peck, as did Lieutenant Vigilante and Sergeant D'Angelo. Diane Grayden, a bystander at the scene, was questioned and she told Detective Perticone that while shoveling snow at her home at 21 Fernwood Avenue, located one or two houses from Portland Avenue, she had seen defendant, a person known to her, running east on Fernwood Avenue, away from Portland Avenue and the hardware store, and that she had said "hello" to him; that this occurred just a few minutes before the police arrived and that she had noticed a black and silver object protruding from his jacket. Because of his prior criminal activity, defendant was known to Detective Perticone, who knew also that defendant's grandmother, Louise Ponder, resided at 66 Aurora Street and that defendant had been apprehended there on previous occasions.

Perticone communicated this knowledge to the other police officers and they all proceeded to the vicinity of 66 Aurora

Street. Perticone, Alfieri and Gropp stationed themselves on a parallel street behind 66 Aurora Street. Parks and Peck approached the side door of the house and observed a .22 caliber bullet which was lying on the snow-covered ground near the door. Parks and Peck knocked on the side door which was opened by defendant, although at that moment he was not recognized by either officer. When asked whether "Wade" was in the house, defendant pointed upstairs with his thumb. Both Parks and Peck continued into the house, leaving defendant unattended at the door. From their position behind the house, Detectives Perticone and Alfieri and Officer Gropp saw Parks and Peck approach the side door and enter the house. Moments later they observed defendant, whom they recognized, run out the side door toward the rear of the house. After a brief chase through back yards, defendant was apprehended by Perticone.

In the meantime Vigilante and D'Angelo, with guns drawn, knocked at the front door, opened it, and entered the house. Vigilante thereupon told Mrs. Louise Ponder, defendant's grandmother, that they were "looking for Wade Ponder in the investigation of a shooting on Portland Avenue" and that they would like to search the house. Vigilante testified that "she more or less didn't object to this". Vigilante and D'Angelo, along with Parks and Peck, continued their search of the house until they learned of defendant's apprehension, at which time, except for Peck, they left the premises.

After arresting defendant, who was then transported by Parks to the Public Safety Building, Perticone entered the house, intending to search for the weapon. He testified that in the presence of Peck he asked Mrs. Ponder for permission to search for the gun and that Mrs. Ponder consented.[1] Shortly thereafter, Peck found a sawed-off .22 caliber rifle located inside a covered washing machine in the basement.

Mrs. Ponder testified that the defendant had arrived at her home only seven minutes before the arrival of the police; that the police had not asked for permission to search her house for the defendant and, with reference to the search for the gun, that Perticone told her it would be necessary to search her house; that when she asked whether the police had a search warrant, she was told that they did not need one and she then said "Oh well, you have to do what you have to do".

---

1. Perticone acknowledged at trial that Mrs. Ponder had asked whether the police had a search warrant.

On arrival at the Public Safety Building, Parks conducted a further search of defendant's person and found 18 rounds of .22 caliber ammunition in defendant's overcoat pockets. Thereafter Parks was joined by Perticone in the interrogation of defendant. At about 6:00 P.M. defendant's written statement was taken by Vigilante and Alfieri in the presence of Perticone. In it defendant described the robbery and admitted the shooting.

Mrs. Ponder further testified that defendant was one of 30 grandchildren and, like the rest, he did not live with her but occasionally spent the night; that no particular room had been assigned for defendant's use; that he was not staying at her home on February 10, 1977; that he never slept in the basement, and that he had no interest in the washing machine and had never used it.

Defendant raises several issues on appeal that are worthy of review. He contends, *inter alia,* that his arrest was without probable cause and that his written statement, as well as the gun, ammunition and overcoat, should be suppressed because of the illegal arrest and because the entry and search of his grandmother's home without a warrant were unlawful. In further support of his argument for suppression of the written statement, he urges that it was prompted by his having learned at the Public Safety Building that the police had discovered the gun and thus the statement was the fruit of the illegal search.

■ Initially, we find that the People failed to carry their heavy burden of establishing that Mrs. Ponder consented to any search, whether it be that for the defendant or that for the gun (see *People v Whitehurst,* 25 NY2d 389). In the circumstances of this case, however, for reasons hereinafter stated, this finding is of no avail to defendant.

■ We reject the claim that defendant was arrested upon less than probable cause. When the police officers arrived at the scene, they immediately became aware that a serious crime had just been committed and that a gun had been used in its commission. They learned from Diane Grayden that the defendant was in close proximity to the scene of the crime immediately after its commission and that he had been seen running in a direction away from the victim's store (see *People v Howard,* 50 NY2d 583, 592) and toward his grandmother's house, just a short distance from the store. They were aware of defendant's criminal background (see *People v*

*Wirchansky,* 41 NY2d 130, 135) and they knew that defendant had previously been apprehended at his grandmother's home. Additionally, when Officers Parks and Peck saw the .22 caliber bullet on top of the snow-covered ground, they could properly assume that it had been but recently dropped there. These factors, considered together with defendant's known possession of a "black and silver object" which the police might reasonably have assumed was a gun, are sufficient to support the conclusion that the police had probable cause to arrest the defendant even before entering his grandmother's home.

■ We are thus led to review defendant's contention that his arrest was unlawful because it was the direct result of an illegal entry by the police into the grandmother's home. In that connection he argues that he is entitled to the protection of the rule enunciated in *Payton v New York* (445 US 573) which proscribes the police, in the absence of exigent circumstances, from making a warrantless arrest of one in his own home. He seeks expansion of that principle to afford him similar sanctuary in his grandmother's home despite the fact that the arrest here was not therein made. Even if we were to assume, however, that the arrest was made away from the grandmother's home only because defendant was "flushed out" by the presence of the police and thus were to view this arrest as having been made in the grandmother's home, we would nonetheless find, because of exigent circumstances, that the arrest was not defective. Within minutes of the shooting, the police were armed with information identifying the defendant and his probable destination. Defendant arrived at his grandmother's home only minutes before the police, who were in close pursuit. Indeed, the conclusion is inescapable that defendant was arrested within one-half hour of the shooting. Given the police confrontation with such emergency circumstances, it would be unreasonable to require that they procure a warrant before effecting defendant's arrest. We thus conclude that the arrest was lawful. It follows, of course, that the ammunition which was discovered and seized in the inventory search at the Public Safety Building was properly received in evidence on defendant's trial *(People v Perel,* 34 NY2d 462, 468).

On the question of whether the gun should be suppressed, defendant asserts with merit that there is no basis in the record to conclude that the police had reason to believe that

the gun was in imminent danger of destruction (see *Vale v Louisiana,* 399 US 30; *Matter of Kwok T.,* 43 NY2d 213; *People v Cadby,* 62 AD2d 52, 59). Thus the police search of the premises without a warrant palpably violated the Fourth Amendment rights of defendant's grandmother. It is axiomatic, however, that the defendant has no standing to assert the Fourth Amendment rights of another *(Alderman v United States,* 394 US 165).

Squarely presented, then, is the issue of whether the "automatic standing" rule, first established in *Jones v United States* (362 US 257), remains viable in this State. In *Jones (supra,* p 263) it was held that where a possessory offense is charged the defendant's standing was not to be conditioned upon a showing that he had "an interest in the premises searched or the property seized". Application of that principle here, consistent with modern practice in New York *(People v Hansen,* 38 NY2d 17), would give defendant the necessary basis for challenging the validity of the search and, in our view, suppression would be required.

In unequivocal language, however, the Supreme Court recently abrogated the automatic standing rule *(United States v Salvucci,* 448 US 83) and has further limited the application of the exclusionary rule by holding that a possessory interest in the goods seized, absent a showing that one has a reasonable expectation of privacy in the place searched, is insufficient to support a Fourth Amendment claim *(Rawlings v Kentucky,* 448 US 98).[2]

Despite the foregoing, we are not bound to reject the automatic standing rule. Analysis dictates, however, that we should. In initially promulgating the rule, the Supreme Court recognized that ordinarily "it is entirely proper to require of one who seeks to challenge the legality of a search as the basis for suppressing relevant evidence that he * * * establish, that he himself was the victim of an invasion of privacy" *(Jones v United States,* 362 US 257, 261, *supra).* Moreover, the language of section 12 of article I of the New York State

---

2. This case does not present a *Rawlings* issue since defendant has never asserted a possessory interest in the gun. We note that in *Rawlings* the goods seized were narcotics which the defendant had no right to possess. The defendant here had no right to possess a loaded firearm. We can only speculate what the result in *Rawlings* might have been had the goods seized been other than "contraband" and the defendant had a legitimate possessory interest in such goods (see Trager and Lobenfeld, The Law of Standing Under the Fourth Amendment, 41 Brooklyn L Rev 421).

Constitution providing for security against unreasonable searches and seizures is verbatim with that of the Fourth Amendment. Such identity of language argues strongly, we think, for a policy of uniformity in both State and Federal forums. Additionally, since the impediment to New York's abrogation of the rule has been removed by the decision in *United States v Salvucci (supra)*, we think it now should be abrogated upon the cogent reasoning of Judge GABRIELLI in his dissenting opinion in *People v Hansen* (38 NY2d 17, 24).[3] Although that dissent was prompted by the Supreme Court decision in *Brown v United States* (411 US 223) in which it was acknowledged that the decision in *Simmons v United States* (390 US 377) had undercut the rationale for granting automatic standing, its reasoning is now far more compelling in light of the recent total abrogation of the rule.

■ We thus conclude that the automatic standing rule should be rejected and this case should be decided not on the basis of whether defendant was charged with a possessory crime but rather, on the basis of whether defendant had a reasonable expectation of privacy in his grandmother's home. Applying that principle, we can only conclude, upon his grandmother's testimony at the suppression hearing, that defendant had no reasonable expectation of privacy in her home or more particularly in a washing machine which he never used, and thus he is without standing to challenge the validity of the search. Accordingly, we hold that the gun, as well as his written statement, were properly received in evidence.

■ Defendant next claims that the court erred in refusing to charge lesser included offenses, other than manslaughter in the first degree, on the intentional murder count of the indictment. We disagree. There was no evidence that the shooting was other than intentional and thus there was no reasonable view of the evidence which would support a finding that defendant committed an offense lesser than manslaughter in the first degree *(People v Russo,* 41 NY2d 1091; CPL 300.50, subds 1, 2). We have reviewed the other claimed errors

---

3. The rule of *Jones v United States (supra* [decided in 1960]) was engrafted upon New York law solely by reason of the decision in *Mapp v Ohio* (367 US 643 [1961]), the latter case holding evidence obtained by search and seizure in violation of the Fourth Amendment to be inadmissible in State courts. Prior to *Mapp,* such evidence was admissible in New York despite the requirements of the Fourth Amendment and section 12 of article I of the New York Constitution (see *People v Loria,* 10 NY2d 368).

in the court's charge and find that they are equally without merit.

■ Nor is there any basis for defendant's claim that the felony murder conviction should be set aside because he was acquitted of the robbery. Robbery is not a lesser included offense of felony murder, nor are the elements of the crimes the same (see *People v Perdue,* 70 AD2d 477). There is neither repugnancy nor inconsistency in a jury verdict acquitting one of robbery while convicting him of felony murder, which requires in common with robbery only an intent to commit the latter crime. A completed robbery is not an essential element of felony murder. We have reviewed defendant's other various claims of error and find them without merit.

Accordingly, the judgment should be affirmed.

CARDAMONE, SCHNEPP, DOERR and WITMER, JJ., concur.

Judgment unanimously affirmed.