OPINION OF THE COURT
Patrick W. McGinley, J.
The defendant, charged with the crimes of murder in the second degree, attempted murder in the second degree and robbery in the first degree, moves to suppress certain physical evidence, statements and identification evidence obtained as a result of his arrest.
Following a hearing held on October 6,13,14,15 and 19, 1981, at which Andrew White, Detective Patrick Sweeney, Police Officer Thomas Reynolds, Lieutenant Edward Brady, Detective Eugene Campbell, and the defendant testified, the court makes the following findings of fact.
At 3:15 a.m. on December 10, 1980, as Andrew White stopped his taxicab at a traffic light at 125th Street and Morningside Avenue, the defendant jumped into the back seat, put a sawed-off shotgun to White’s neck, and ordered him to drive to an apartment project. Shortly thereafter, the defendant entered the driver’s seat and pushed White over to the passenger side. After taking White’s money, watch and other items, the defendant announced, “I’m *579 going to have to blow you away now because you know what I look like.”
White and the defendant began to struggle over the shotgun, which discharged, putting a hole in the roof of the cab. The defendant kicked White out of the cab and drove off. White flagged down another cab driver, and the two located Police Officer Thomas Reynolds, who drove White around in an attempt to find his stolen taxicab. They located the abandoned taxicab at Broadway and 136th Street at approximately 4:00 a.m.
While searching the cab, Reynolds came across a wallet, which he assumed belonged to White. On inspection, however, White saw a picture of the man who had robbed him and so informed the police. The wallet also contained various identification cards and pictures, all in the name of Yohannes Johnson. The address shown on a Medicaid card and a Con Edison bill was apartment 3E, 1269 Sheridan Avenue, in The Bronx.
At approximately 12:00 p.m. on December 10, Lieutenant Edward Brady, the commanding officer of the 30th Precinct’s Detective Unit, sent Detectives Ralph White and Eugene Campbell to the address found on the cards in the wallet to confirm the address as that of the defendant. The superintendent of the building informed the officers that he believed the defendant lived in apartment 3E with his girlfriend, but that the defendant was not in the apartment at the time; however, he promised to call the police upon the defendant’s return to the apartment.
As the investigation broadened, the police began to focus on the defendant as a suspect in a series of incidents which had occurred shortly before the White robbery. Late in the evening of December 9 and during the early morning hours of December 10, a red tow truck was stolen while its driver was at a phone booth. Shortly after midnight, Miguel Collarzo was parking his car when two men got out of a red tow truck and stole his money and his car while pointing a sawed-off shotgun at him. At 2:00 a.m., Erroll Blackwood, a cab driver, was at a phone booth when he was gunned down by a man with a sawed-off shotgun; he died six hours later. The defendant’s fingerprint was found by the police *580 on Blackwood’s cab. The next incident in this chronology was the shotgun robbery of Andrew White. At 9:00 a.m. on December 10, the defendant went to the 44th Precinct to report that his wallet had been stolen by two people in a tow truck.
At approximately 9:00 p.m. that evening, the superintendent of 1269 Sheridan Avenue called the 30th Precinct and informed the officers that the defendant had returned to apartment 3E.
Three officers arrived at the defendant’s front door and two others stationed themselves on the roof of the building. One of the detectives knocked on the door of apartment 3E, and when a female voice asked who was there, the detective responded, “Debra, I’d like to speak to you.” Debra Kennedy lived in apartment 3E with the defendant. The defendant then went to the door and asked who was there. The officers identified themselves and Ms. Kennedy began to open the door. The defendant, believing someone was playing a practical joke, pushed her aside, and stepped out of the apartment and into the hallway. As he did so, the door to the apartment which had an automatic spring, closed behind him but did not lock. The police immediately apprehended the defendant in the hallway.
Ms. Kennedy came to the door and became hysterical when she saw that the police had taken the defendant into custody. She screamed and ran back into the apartment towards the couch. Detective Williams ran into the apartment after her in order to calm her down. When he entered the apartment, Williams saw the top of a sawed-off shotgun protruding from under the cushions on the couch towards which Ms. Kennedy was running. The officers then secured the apartment.
Detective White administered the Miranda warnings to the defendant in the hallway and repeated them more formally at the 30th Precinct. The defendant made statements at the precinct which were subsequently video taped during interrogation by an Assistant District Attorney at the police station.
On the following day, December 11, a warrant was obtained to search the Sheridan Avenue apartment. The sawed-off shotgun, shells, several items of clothing and a *581 wristwatch were seized shortly thereafter. At a lineup conducted on December 11, Andrew White made a corporeal identification of the defendant.
In a motion to suppress physical evidence, the People have the burden, in the first instance, of going forward to show the legality of the conduct of the police while the defendant bears the ultimate burden of proving that the evidence should be suppressed by a preponderance of the evidence. (People v Berrios, 28 NY2d 361; People v Sanders, 79 AD2d 688; People v Coles, 104 Misc 2d 333.)
The defendant contends that the officers arrested him in his home without an arrest warrant. Therefore, his arrest was illegal under Payton v New York (445 US 573, on remand 51 NY2d 169) and the fruits obtained as a result of such arrest must be suppressed. (Dunaway v New York, 442 US 200; Wong Sun v United States, 371 US 471.)
Concededly, the officers involved in the investigation and arrest of the defendant were aware of the Payton ruling but testified that the time it would take to procure a warrant, the circumstances of the case, and the pressing need to take a dangerous suspect into custody, all dictated against conforming to Paytons requirements.
The court finds no substance to these arguments insofar as they relate to the failure of the police to obtain a warrant. The officers became aware of the defendant’s location during the early morning hours of December 10, 1980 and, therefore, had sufficient time in which to obtain a warrant for the defendant’s arrest. The defendant was arrested some 17 hours after the police became aware of his identity and address.
Although the police had sufficient time in which to procure a warrant, the court finds the requirements of Payton to be inapplicable to the instant case. The Supreme Court held in Payton that the Fourth and Fourteenth Amendments prohibit police from making a warrantless and nonconsensual entry into a suspect’s home in order to make a routine felony arrest.
The purpose behind such ruling lies in the nature of the home. “ ‘To be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the *582 sanctity of the home. This is simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances, even * * * when probable cause is clearly present.’ ” (Payton v New York, supra, at pp 588-589; United States v Reed, 572 F2d 412, 423, cert den sub nom. Goldsmith v United States, 439 US 913.)
Although a person has a clear expectation of a right to privacy in his home, the outer limits of his home are not so sacrosanct. “[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.” (Payton v New York, supra, at p 590.)
The testimony relating to the arrest of the defendant was conflicting, even among the prosecution witnesses. However, after careful consideration of all the testimony and applying the clear language of Payton, this court concludes that the police did not cross the threshold; rather, the defendant voluntarily crossed the threshold from his apartment to the hallway and, therefore, is not entitled to the relief requested. The court holds that the warrantless arrest of the defendant occurred in a public place and was supported by probable cause. Therefore, the defendant’s arrest did not violate the Fourth Amendment. (United States v Watson, 423 US 411.)
“While it may be true that under the common law of property the threshold of one’s dwelling is ‘private,’ as is the yard surrounding the house, it is nonetheless clear that under the cases interpreting the Fourth Amendment [the defendant] was in a ‘public’ place. She was not in an area where she had any expectation of privacy.” (United States v Santana, 427 US 38, 42.)
The defendant himself testified that after he stepped out into the hallway, the door to the apartment closed behind him, thereby removing him from the privacy of his home and exposing him to public scrutiny. Clearly this was a most fortuitous event as far as the police were concerned but one whose advantage they may take.
“The common areas of an apartment building, even if they are normally kept locked, are not places in which tenants of the building have a reasonable expectation of *583 privacy.” (United States v Moore, 463 F Supp 1266, 1270; United States v West, 494 F2d 1314, cert den 419 US 899; United States v Ortega, 471 F2d 1350, cert den 411 US 948; United States v Wilkes, 451 F2d 938; United States v Llanes, 398 F2d 880, cert den 393 US 1032; United States v Boyd, 407 F Supp 693.)
In United States v Mason (661 F2d 45), the defendant’s paramour informed the police that the defendant was the source of counterfeit currency which she was trying to pass. The agents who arrested her took her to the house she shared with the defendant. The defendant came to the front door as his girlfriend and the agents approached the house. The agents identified themselves and arrested the defendant.
The court upheld the warrantless arrest of the defendant at the door of his home on the basis of Santana, since he was in a public place and had no protectable expectation of privacy.
In People v Murphy (55 NY2d 819), four uniformed police officers arrived at the defendant’s door after receiving his name and address from an anonymous caller. The officers knocked on the door and a man clad only in his underwear answered. When asked if his name was Joe, the defendant responded affirmatively.
At the Huntley hearing, one of the officers testified that he placed one hand on the defendant’s door and told the defendant that the bar around the corner had been broken into. He then asked the defendant if he would mind if the officers entered his apartment and “straighten it out”. The defendant nodded and the officers walked in and saw clothing that matched the clothing that the suspect had reportedly been wearing at the time of the break in. The defendant stated that the clothing was his and the officers placed him under arrest.
The Court of Appeals held that the presence of four uniformed officers, the officer placing his hand on the door and the fact that the defendant was clad only in his underwear is relevant to the issue of the voluntariness of the defendant’s consent to the officers entering his apartment. The court found no reason to disturb the lower court’s finding of voluntary consent.
*584 In the instant case, the defendant himself testified that he stepped out into the hallway thereby permitting the apartment door to close behind him. Perhaps the defendant stepped into the hallway because he knew the police were there to arrest him, or because he thought someone was playing a practical joke. Perhaps he believed the police came to the apartment to follow up on the robbery complaint he had lodged the previous morning with the precinct. Whatever his thought processes, the defendant’s voluntary act of stepping out into the hallway, allowing the door to the apartment to close behind him, was clearly not in response to a command from lawful authority. Although the police had announced their identities, the defendant exited voluntarily. He was not “flushed out” by police action (People v Ponder, 77 AD2d 223) but rather, opened the front door to go out, thereby revealing himself to the view of the officers in the public area outside the door. (United States v Moore, supra.) By leaving the sanctuary of his home, the defendant removed any constitutional barrier to his warrantless arrest.
The court holds that Payton does not apply when a defendant voluntarily steps across the magical threshold defined by Payton.
The court has considered the other contentions raised by defendant and finds no merit thereto. For the reasons stated above, the defendant’s motion to suppress is denied.