■ THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v JACQUELINE WOODS, Respondent. — The People appeal from an order of the Supreme Court, Kings County (Ramirez, J.), entered January 5, 1981, which granted defen-

dant's motion, after a hearing, to suppress certain incriminating statements she made. Order reversed, on the law, motion denied and matter remanded to the Supreme Court, Kings County, for further proceedings. The defendant was charged with one count of first degree manslaughter arising from the death by drowning of defendant's infant daughter. Defendant's husband returned shortly before midnight on October 1, 1979 to find his three- and one-half-year-old daughter dead in the bathtub and his wife lying on the bathroom floor, bleeding, with her neck, arms and legs slashed. At about 1:45 A.M. on October 2, 1979, a detective spoke with the defendant in the hospital. She was receiving treatment and had a tube in her throat to aid breathing. She was conscious, had not been sedated and was considered unlikely to die. The detective identified himself and explained that he would like to ask her questions, asking if she could respond with eye-blinking signals for yes and by closing her eyes for no. After the defendant indicated that she would so respond, the detective read her the *Miranda* warnings. When asked if she understood the warnings she blinked an affirmative signal and also nodded her head when she was asked whether she had held her daughter's head under water until the child stopped breathing. The People do not seek to use this admission at trial. Although the defendant displayed some signs of pain, doctors attending her at the time did not try to limit the detective's questions nor did defendant indicate that she was unable to understand. Approximately eight hours later, at 10:00 A.M. on October 2, 1979, the 68th Police Precinct received a telephone call indicating that the defendant wished to speak to the police. A second detective went to the hospital and found the defendant catheterized and attached to an intravenous device with bandages on her wrists and neck but with no throat tube. The detective read the *Miranda* warnings to the defendant for the second time after which she said she would willingly talk without an attorney. She then described holding the child under water. At that time the defendant spoke coherently and was responsive. As with the earlier admission, the People do not seek to use this admission at trial. The first detective, who had been with the defendant at the time of her initial admission some eight hours earlier, then arrived and the defendant said she would again speak to him. He, too, read her the *Miranda* warnings and told the defendant he would write down her statement, so she should "go slow". She then described the events of the previous night, and the detective wrote them down, using a personal form of shorthand. The detective's written record of the defendant's statement contained a description of the crime, some explanatory comments about her own alcoholic parents and comments about her in-laws who the defendant stated always ridiculed her. The defendant signed the written statement and one of the detectives signed it as a witness. The defendant signed the statement with some difficulty because of the bandages and apologized to the detectives because of her inability to write in a normal manner. The detectives left about noon. At approximately 1:00 P.M. an Assistant District Attorney came to the defendant's bedside and requested that she answer questions. The Assistant District Attorney read the *Miranda* rights to the defendant who said she wanted an attorney of her own, that she had told everything to the detectives and asked the Assistant District Attorney why she didn't just speak to the detectives. The Assistant District Attorney said she would like to hear what happened herself, and the defendant said, "Well, I was very sick" and adhered to her decision to request the presence of an attorney. A Dr. Dorval, who had treated the defendant from approximately 11:50 P.M. on October 1 to between 5:00 and 6:00 A.M. on October 2, 1979, for loss of blood and the injuries, testified on behalf of the defendant. He said the defendant was unconscious when admitted to the hospital but had regained consciousness

when he began his treatment. She was still lethargic and was in shock, indicating loss of more than one third of her blood. The blood supply to the brain had not been affected by the neck injury. Intravenous transfusions were begun immediately and a tube to relieve respiratory distress (associated with shock) was inserted through her mouth. She was given no drugs. Dr. Dorval testified that shock results in drowsiness and an inability to concentrate. These symptoms normally pass within five to six hours when fluid is replaced. A patient could "talk, you see, but you can't concentrate very well, you see, but you can talk to somebody, but you are not — you know, in complete clarity of the mind, but this — you know, this is for the shock, when you are in shock, but when you come out of the shock, you should be able to — you know, to have your — you know, everything come back again." She did not respond as quickly as he expected so at 1:45 A.M. he ordered a test of blood and urine to see whether any drugs were present. He could not evaluate what the defendant's mental state would have been by 11:30 A.M., approximately 5½ hours after he stopped treating her. She did improve throughout the six hours he treated her. An entry at 2:45 A.M. on the defendant's chart, by a consulting physician, listed her as "alert", but Dr. Dorval could not explain what the consulting physician had meant by the term. The defendant's second witness was a psychiatrist, Dr. Komareth, who had treated the defendant from January 5, 1976 to November, 1976 and again from June, 1977 to January, 1979. He had seen her once in February, 1979. In 1976 he had diagnosed her as a "residual schizophrenic". He did not see her after February, 1979 until 2:00 P.M. on October 2, 1979, after the Assistant District Attorney had left the defendant. However, the defendant's husband had visited Dr. Komareth on August 20, 1979, reporting that the defendant was agitated, sleepless and made irrational statements. The doctor prescribed a week's medication, suggested she come to see him (she did not) and gave the husband a letter to the police advising them to "pick her up" for psychiatric examination because of her earlier history of trying to hurt herself. When Dr. Komareth saw her on October 2, she was on a stretcher, was pale, and had an intravenous needle in her arm. When he asked her what had happened, she replied "You are not my Doctor now. I do not want to speak with you." Dr. Komareth continued and she repeated that she did not want to talk to him and turned her head away. He thought this illogical. He said she presented a "flat affect" so he concluded, on the basis of her appearance, statement and his previous acquaintance with her, that she was in a "kind of physical and psychotic, mental shock." He thus opined she could not have understood questions and could not have understood the *Miranda* warnings. The hearing court stated that in an ordinary case, he would admit the defendant's statements, but that this was not an ordinary case. He relied primarily on the testimony of Drs. Dorval and Komareth and his own analysis. We disagree. In determining whether a suspect has made a knowing and intelligent waiver of his or her *Miranda* rights the Supreme Court has directed lower courts to review the totality of the circumstances surrounding the waiver (see 2 Ringel, Searches & Seizures, Arrests and Confessions, § 28.4). Likewise, the Court of Appeals tells us that a determination as to voluntariness can best be accomplished by employing such a test (*People v Anderson,* 42 NY2d 35, 38; see *People v Adams, 26 NY2d 129),* and that New York requires proof beyond a reasonable doubt (*People v Yarter,* 41 NY2d 830; *People v Huntley,* 15 NY2d 72, 78). We are convinced that the People established the defendant's volitional competency beyond a reasonable doubt and that the testimony adduced on behalf of the defendant was not sufficient to raise any reasonable doubt on that issue. Dr. Dorval was unable to give an opinion as to the defendant's condition some 5½ hours after he treated her. He said that

shock victims generally recover coherence five to six hours after treatment with fluid. Even if this patient were slower than predicted, approximately 11 hours had passed between her hospitalization when treatment began and her conversation with the two detectives. In fact, the only evidence in the record describing the defendant during this time period came from the two detectives found credible by Criminal Term, to the effect that she was coherent, had no trouble communicating, was responsive, appeared comfortable and uttered no complaints as to pain. The psychiatrist, who had not seen her for some eight months but who had prescribed medication for her once during that period, thought she was being "illogical" because of her statement that she did not want to speak to him. It would appear perfectly reasonable, however, that she did not want to talk to him because he was no longer her doctor. It must be remembered that the psychiatrist did not even see the defendant until at least one hour after she had availed herself of her *Miranda* rights and insisted on an attorney's presence before she would speak to the Assistant District Attorney. Dr. Komareth never testified that the defendant was incoherent or unresponsive and his observations of her do not convince us that her statements were made involuntarily or that the waiver of *Miranda* rights was not voluntarily made. In sum, we believe that the People have met their burden to establish their voluntariness. (See *People v Yarter,* 41 NY2d 830, *supra; People v Huntley,* 15 NY2d 72, 78, *supra.*) The defendant was able "to appreciate the nature and consequences of [her] statements". (*People v Schompert,* 19 NY2d 300, 305, cert den 389 US 874.) The defendant's statements were trustworthy, an important factor in determining whether an allegedly disabled confessant was aware of the consequences of his or her actions. (*People v Adams,* 26 NY2d 129, 137, *supra.*) We thus have before us an uncoerced and reliable confession. The evidence on the sole issue of whether the defendant understood the nature and consequences of her statements made between 10:30 A.M. and 1:00 P.M. is uncontroverted and establishes beyond a reasonable doubt her competency to make the statements. Thompson, J. P., Niehoff and Rubin, JJ., concur.

Brown, J., dissents and votes to affirm the order, with a memorandum, in which Boyers, J., concurs. I respectfully disagree with the majority's conclusion that the People have sustained their burden of proving the volitional competency of the defendant to waive her *Miranda* rights. The People had the heavy burden at the *Huntley* hearing of proving the admissibility of the defendant's statement beyond a reasonable doubt (*People v Huntley,* 15 NY2d 72; *People v Yarter,* 41 NY2d 830) and were required to establish that the defendant knowingly and intelligently waived her rights before any statement made by her could be received in evidence (*Miranda v Arizona,* 384 US 436). For the purpose of determining whether the People met their burden, the rule is that "aside from a case where descent to physical brutality may make it obvious that a confession is 'inherently coerced' * * * the involuntariness of an inculpatory statement may usually best be uncovered by looking at the 'totality of the circumstances' under which it came about" (*People v Anderson,* 42 NY2d 35, 38). In my opinion, the People failed to sustain their burden. Although there is sufficient testimony to conclude that defendant's statements were reliable (see *People v Schompert,* 19 NY2d 300, cert den 389 US 874), it is my view that defendant's capacity for self-determination was critically impaired as a result of mental and physical factors so that she was unable to knowingly and intelligently waive her *Miranda* rights. This finding is warranted based upon the "totality of the circumstances" present here, including the defendant's history of mental illness, the bizarre nature of her crime, the inability of Dr. Dorval to state whether the defendant had recovered by the time of her questioning from shock caused by the loss of more than one third of

her blood and the testimony of Dr. Komareth that defendant was in shock when he spoke with her shortly after she was questioned. Dr. Komareth's testimony is particularly enlightening. He stated that on October 2, 1979, at 2:00 P.M., he saw the defendant at the hospital in the emergency room. He described her condition as follows: "[S]he was lying down on a stretcher. She had an IV needle in her arm. She was very pale. She was in the — in her hospital clothes. When I asked her what happened, she said, 'I don't want to talk to you'. Her face registered no emotions and this is — flat affect, very withdrawn." He described this "flat" affect in the following language: "Yes, it's used by psychiatrists. Affect means when you throw a ball against the wall, there is a response. The same way when a question is put to a patient there is a response in the face, in the body and in the speech. In a schizophrenic state, often, the response is partial or absent and this is called flat affect. That is, the response is not like an ordinary person. There is no real vitality behind her response, no bounds to it." Dr. Komareth concluded that from a clinical standpoint the defendant was "in a kind of physical and psychotic, mental shock" as a result of which she could not have understood questions from a conceptual standpoint. Thus, the doctor concluded that the defendant could not have understood the *Miranda* questions "[b]ecause she was in a state of withdrawal and such a state of psychotic shock and her affect and her response were so markedly removed from reality that she may respond by words but she certainly could not have understood the meaning or the nature of the whole thing". Under all of the circumstances here present, I would affirm Criminal Term's order suppressing the statements made by the defendant.