OPINION OF THE COURT
Donald P. DeRiggi, J.
A Dunaway-Huntley hearing was held beginning November 2, 1994 and continuing on November 3 and November 7, 1994.
FINDINGS OF FACT
On May 15, 1994, at about 6:35 p.m., Police Officers Donnelly and Marti responded to a radio call for possible child *161 endangerment at 39 Shore Avenue, Oyster Bay, New York. The assignment was in response to a 6:30 p.m. 911 call from Brookville. The female 911 caller said that her daughter-in-law was possibly intoxicated and not able to take care of her 12-month-old child.
The two police officers entered 39 Shore Avenue and found it empty. When they relayed this information to police headquarters, a supervisor told Donnelly to remain at the scene while Marti was directed to another call at a location about 100 yards away. Shortly thereafter, Mr. Ross Hudac approached Donnelly and asked "Where’s the kid?” When Donnelly asked him what was going on Hudac walked over to and entered a house at 54 Shore Avenue. A few minutes later Hudac emerged from 54 Shore Avenue and told Donnelly "everything’s okay.” Donnelly explained to Hudac that the police received a call involving child abuse. He asked Hudac where the child was. Hudac then reentered 54 Shore Avenue and came back with an apparently healthy child in his arms. Hudac said that he was the father of the child. Hudac said that he wanted to take the child home whereupon Donnelly asked for the location of the child’s mother. Hudac told Donnelly that the mother was drunk and in the upstairs apartment at 54 Shore Avenue.
Fifty-four Shore Avenue is a two-family, private residential building. Two doors at street level access the two apartments; one leads to the street level apartment and one leads to the stairway which ascends to the second floor apartment.
Donnelly entered the right-hand unlocked outside door, went up the stairs and knocked on the door which immediately bordered the top step.* When a voice from behind the door asked "Who is it?” Donnelly responded "Police — I want to talk to you.” In response, the voice said "I don’t want to talk to you, I had nothing to do with this.” Donnelly backed down about three of the steps, the door opened, and Donnelly received a kick in the neck from defendant, knocking him down the stairs. Defendant pursued the officer, and kicked him again, and followed him through the door and out onto the porch, shouting "I am going to fucking kill you!” Defendant then picked up a chair and threw it at Donnelly. The *162 defendant then reentered the building, locked the lower door and went upstairs.
Donnelly radioed for assistance. Marti returned in about 5 to 10 seconds and they forced their way through both the lower and upper doors, entered defendant’s apartment and arrested him.
Defendant appeared intoxicated. He was placed in a police vehicle and transported to the Second Squad by Officers Marti and Stangenelli. During the ride, without being asked any questions, defendant said "I kicked him in the shoulder, not in the neck. I didn’t know he was a police officer. I thought he was a friend.” Defendant repeated these things twice. After the second repetition, Stangenelli said "How could you not know he was a cop — he was wearing a uniform.” Defendant rambled on and repeated the substance of the above statement two more times during the ride to the station house.
Detective Polley of the Nassau County Police Department was assigned to investigate the assault allegation. He met with defendant at about 8:00 p.m. in the Second Squad office. The defendant was in custody. Before speaking to the defendant, Detective Polley had spoken to Police Officer Marti about the incident.
Detective Polley read Miranda warnings and rights to the defendant from a standard form 233. The defendant stated that he understood the contents of the warnings and rights but he refused to answer any questions. The defendant did not ask for a lawyer.
Although Detective Polley did not continue to question defendant, he did continue to process him. When the detective told defendant he was being charged with assault, second degree, defendant replied, "For what”, "I didn’t do anything * * * the police broke in and took me here * * * I was watching TV * * * I didn’t kick him * * * I pushed him”.
The defendant’s statements occurred between 9:00 and 10:00 P.M.
Although Detective Keteltaas was at the Second Squad when the defendant arrived at the police station, he was not involved with the arrest nor in the investigation and was in and out of the room in which the defendant was seated. At about 1:00 a.m. on May 16, 1994, Keteltaas and defendant were alone. The following conversation took place at about 1:00 A.M.:
"Defendant: You don’t like me do you?
*163 "Keteltaas: Not particularly, you struck a police officer. I don’t want to talk to you.
"Defendant: I didn’t do anything, I didn’t know he was a cop.
"Keteltaas: That’s a lie.
"Defendant: I knew he was a cop but he tried to get into my apartment. He pissed me off so I pushed him — I kicked him.
"Keteltaas: Then you went down the stairs.
"Defendant: No, I didn’t.
"Keteltaas: Two women said they saw you and you did go down the stairs.
"Defendant: Alright, I went down to lock him out, he pissed me pif.”
CONCLUSIONS OF LAW

The Entry

While true that a common hallway of a multiple-occupancy dwelling is a public place in which tenants ordinarily have no expectation of privacy (People v Covert, 134 AD2d 444 [2d Dept 1987]; People v Jacobo, 154 Misc 2d 540 [Sup Ct, NY County 1992]; People v Johnson, 114 Misc 2d 578 [Sup Ct, NY County 1982]; cf, People v Beltrand, 63 Misc 2d 1041 [Crim Ct, NY County 1970]), in this case there was insufficient evidence to merit a finding that the hallway was shared by any other apartments, or was otherwise available to the public.
Because the child that was the subject of the 911 call was out of danger, entry into the hallway cannot be justified by exigent or emergency circumstances. (See, People v Love, 84 NY2d 917; People v Lenart, 91 AD2d 132 [2d Dept 1983] [prosecution has the burden of proving that a warrantless entry falls within the emergency doctrine].)
Even if it were assumed, arguendo, that Donnelly’s entry into the hallway was not adequately supported, suppression is not warranted on these facts. Where illegal police conduct causes a spontaneous illegal act, it is true that attenuation must be demonstrated to avoid suppression. (People v Wilkerson, 64 NY2d 749 [1984]; People v Howard, 50 NY2d 583 [1980]; People v Cantor, 36 NY2d 106 [1975].) In People v Townes (41 NY2d 97, 102 [1976]), however, the Court held that where police made an inadequately supported command to defendant to "freeze,” and defendant produced and pulled the *164 trigger of a gun pointed at the officers, that his "free and independent action in pulling and attempting to fire the gun, taken after and in spite of, or perhaps because of [a police officer’s] identification of himself as a police officer, served to render any 'connection between the lawless conduct of the police and the discovery of the [weapon] "so attenuated as to dissipate the taint.” ’ ” Similarly, in People v Green (81 AD2d 621, 623 [2d Dept 1981]), the Court held that an arguably inadequately supported entry into a premises was attenuated by defendant’s secreting of a gun between his legs. The Court stated: "Even if we were to assume that the entry of the police upon the premises was unlawful, we would hold that defendant’s act in dropping the gun was not a direct response to illegal police conduct but was an independent act calculated to rid himself of incriminating evidence. Since the police were present only to locate a homicide suspect and their actions were not designed to uncover the weapon or any other evidence, such assumed illegal entry on their part lacked the element of purposeful exploitation which would taint the discovery of the weapon.”
The same result was reached by the Court of Appeals in People v Boodle (47 NY2d 398 [1979]). In Boodle, the defendant, after an unlawful seizure, threw a revolver out the window of the police car he was seated in. The Court found defendant’s independent and calculated act to rid himself of evidence dissipated the taint of the unlawful seizure.
On the present facts, when defendant opened his hallway door and kicked an identified police officer down the stairs and continued to assault him, it constituted free, independent, calculated action, which "taken after and in spite of, or perhaps because of [the police] identification * * * served to render any 'connection between the lawless conduct of the police and the discovery of the [weapon] "so attenuated as to dissipate the taint.” ’ ” (People v Townes, 41 NY2d 97, 102 [1976], supra.) This is especially true here, where the officer’s objective was to locate the child’s mother, not to search for evidence. Thus, the "police illegality lacked the 'quality of purposefulness’ to uncover incriminating evidence.” (People v Boodle, 47 NY2d 398, 404 [1979], supra.)
When, after the assault upon Donnelly, defendant retreated back into his apartment, the police were justified in entering the apartment and arresting him. (People v Thomas, 164 AD2d 874 [2d Dept 1990] [criminal suspect may not *165 thwart an otherwise proper arrest which has been set in motion in a public place by retreating into his residence].)
Accordingly, the entries by the police into the hallway and then the apartment presented no basis upon which to base suppression relief.

The Statements

During his transport to the police station, defendant was in custody, and without the benefit of Miranda warnings. The first statement that he kicked the officer in the shoulder, not the neck, and that he believed the person he was kicking was a friend, not a police officer, was spontaneous, and not the product of interrogation, or its equivalent. It is well settled that "[volunteered statements are admissible provided the defendant spoke with genuine spontaneity 'and not the result of inducement, provocation, encouragement or acquiescence, no matter how subtly employed.’ ” (People v Rivers, 56 NY2d 476, 479 [1982]; People v Maerling, 46 NY2d 289 [1978]; People v Hawthorne, 145 AD2d 569 [2d Dept 1988]; People v Ondrizek, 141 AD2d 770 [2d Dept 1988].) Defendant’s two initial, spontaneous statements are available to the prosecution for use at trial.
The final in-transit statement was induced by the officer’s inquiry as to how defendant could not know the uniformed Donnelly was a cop. Accordingly, it is suppressed as the sole fruit of an unwarned custodial interrogation equivalent.
The People also seek to introduce conversations which purportedly took place between defendant and Detective Polley and defendant and Detective Keteltaas. As a factual matter, both conversations took place while defendant was in custody at the police station, but after warnings had been administered by Detective Polley.
In determining whether a suspect has made a knowing and intelligent waiver of Miranda rights it is necessary to review the totality of the circumstances surrounding the waiver to see if the People have proven the issue beyond a reasonable doubt. (People v Woods, 89 AD2d 1022 [2d Dept 1982].) The court is convinced that statements made by the defendant at the station house to Detectives Polley and Keteltaas were voluntary, preceded by adequate warnings and a valid waiver. Additionally, with respect to the Detective Polley conversation, the court has found, as a factual matter that *166 it occurred during the course of processing and pedigree questioning, which need not be preceeded by Miranda warnings. (People v Rodriguez, 39 NY2d 976 [1976].)
Thus, to the extent defendant moves to suppress on this basis, the motion is denied.
Accordingly, defendant’s motion to suppress is granted to the extent that the final statement purportedly made while in transit to the police station is suppressed. In all other respects defendant’s motion is denied.

 This court finds that his objective was to ascertain whether the child’s mother was, in fact, inside, and if so, whether she wanted Hudac to take the child.